**Billy Ray PARSONS, Plaintiff,**

**Consolidated Rail Corporation, Defendant/Third Party Plaintiff–Appellant,**

v.

**The SORG PAPER COMPANY, Third Party Defendant–Appellee.**

No. 90–3854.

United States Court of Appeals, Sixth Circuit.

Argued May 13, 1991.

Decided Aug. 27, 1991.

Gary D. Bullock (argued and briefed), Steven H. Ray (briefed), Dinsmore & Shohl, Cincinnati, Ohio, for Consolidated Rail Corp.

Gary W. Auman, Dunlevey, Mahan & Furry, Steven H. Ward (argued and

briefed), Dayton, Ohio, for The Sorg Paper Co.

Before NORRIS and SUHRHEINRICH, Circuit Judges, and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

This action began with Plaintiff Parsons' claim under the Federal Employers' Liability Act ("FELA"), 42 U.S.C. § 51 *et seq.* against his employer Consolidated Rail Corporation ("Conrail"). Parsons, a train conductor for Conrail, twisted his ankle when he stepped on debris as he dismounted a train car which was in the yard of The Sorg Paper Company ("Sorg Paper"). Parsons' claim against Conrail was eventually settled. Meanwhile, Conrail filed a third-party complaint against Sorg Paper for indemnity based on a sidetrack agreement. Following trial on the merits, the district court rejected Conrail's indemnification claim, holding that Conrail's negligent conduct contributed to plaintiff's injury. We conclude that under Ohio's common law of indemnity, the applicable law of this case, Sorg Paper was obligated pursuant to the sidetrack agreement to fully indemnify Conrail. Accordingly, we reverse.

### I.

The condition of Sorg Paper's yard around the time of plaintiff's injury is crucial to the outcome of this case. On June 5th, 1987, plaintiff was in charge of delivering and "spotting" cars for Conrail on one of Sorg Paper's several sidetracks in its yard in Middletown, Ohio. Plaintiff Parsons had placed a car on spot 2 of sidetrack 924 and, as he dismounted the car, twisted his ankle when he stepped on an object covered by a piece of paper. Conrail's subsequent inspection of the area revealed a piece of wood at the place of injury.

Conrail knew from plaintiff's complaints prior to his injury that the track was "rough" on sidetrack 923 and that at one time there were rolls of paper so close to the track that one could not get into the dock. Conrail also received several general complaints "about either paper or other debris on or about the tracks at Sorg Paper between 1980 and 1987." The record is unclear, however, as to which areas of the yard were involved or how many of that type of complaints were made. On the day of the injury, Conrail did not know that there was paper or wood around sidetrack 924 (although plaintiff testified that there is "always" paper and debris in that area).

Both Sorg and Conrail have maintenance programs for the railroad tracks in Sorg Paper's yard. Sorg Paper employs at least three individuals who are charged with the responsibility for housekeeping the railroad tracks and the areas immediately adjacent to them. For instance, Spence, one of the three employees and a "power sweep operator," testified that in 1987 he "swept" the area at issue several times a week and whenever his boss told him to do so. Conrail, in turn, conducted annual inspections of Sorg Paper's sidetracks, although the trial judge pointed out that no written record of the inspections was maintained. According to Conrail's Trainmaster, Robert Bradford, and its Track Supervisor, Vernon Lakes, Conrail also conducted safety committee inspections of the sidetracks every quarter or six months. Conrail's employees were well versed in applicable safety and maintenance rules. Immediate supervision of the premises however appears, by practice and application of the sidetrack agreement, to have been entrusted to Sorg.[1] Logic supports this conclusion as well, for Sorg was in primary possession of the premises. Its employees could normally be expected to police the area, and would also probably be more likely to engage in

---

1. For example, under the sidetrack agreement, Sorg Paper "shall, without expense to the Railroad, obtain all licenses, franchises, or privileges, if any are necessary, for the maintenance and operation of the tracks...." Sidetrack Agreement (March 4, 1931), at ¶ 3. Sorg Paper is also required to "keep said tracks clear of obstructions ...," *id.* ¶ 4, and assume all respon-

sibility for and indemnify Conrail "against loss or damage to property of the Industry [Sorg Paper] or to property upon its premises, regardless of Railroad's negligence, arising from fire caused by locomotives operated by the Railroad on said tracks, or in the vicinity thereof...." *Id.* ¶ 8. *See also infra* note 2.

activities which could cause dangerous conditions to arise.

There was a fair amount of oral testimony that Conrail and Sorg Paper generally took care of whatever complaints they received. The Traffic Manager for Sorg Paper, Shelby Pelfrey, testified to several instances where he received complaints about various problems, like a bundle of paper being too close to the track, which he said he resolved. Bradford also testified that "whenever I brought a complaint to [Pelfrey's] attention, it was taken care of." Further, the safety committee inspections would report to Sorg Paper, among other problems or hazards, "paper along the tracks where the crews were spotting cars...."

Finally, when asked whether any written or oral complaints Lakes had made between 1980 and 1987 concerning debris or paper on or about the tracks invoked a response from Sorg Paper, Conrail's Track Supervisor testified, based on personal observation, that Sorg Paper "usually took good care of the complaints. They would get some people in to clean them up or whatever." If he had known about any paper, wood, or other hazard in the area of sidetrack 924 on June 5, 1987, Lakes (Conrail's track supervisor) testified he would have cleaned it up. Lakes personally observed Sorg Paper employees taking care of complaints he made to Sorg Paper. Donald Shebesta, a Conrail engineer, testified to the same effect, while also admitting that Sorg Paper never took care of plaintiff's complaint regarding the "rough" track.

## II.

Under FELA, Conrail "has the nondelegable duty to provide an employee with a safe place to work." *Schiller v. Penn Cent. Transp. Co.*, 509 F.2d 263, 269 (6th Cir.1975). "This is so despite the fact that it may not own, control, or be under a primary obligation to maintain the premises on which the employee is injured." *Id.* Thus, Conrail is liable to Parsons *as a matter of law* and "is not relieved from liability because such premises are unsafe or because of the existence of an unsafe condition brought about through the act of another and without fault, on the railroad's part." *Id.* While Conrail may not evade its nondelegable duty, courts have recognized that through indemnification provisions railroads may seek contributions from third party industries. *See, e.g., Burlington N., Inc. v. Hughes Bros., Inc.*, 671 F.2d 279 (8th Cir.1982). To us, this pact represents a classic case for application of that principle.

The sidetrack agreement between Conrail and Sorg Paper, entered into on March 4, 1931, provides that Sorg Paper will indemnify Conrail for any loss, damage or injury resulting from any "act or omission" of Sorg Paper. Additionally, the agreement provides that if any liability arises from the "joint or concurring negligence" of both Conrail and Sorg Paper, both parties shall bear liability equally.[2]

Based on predictions as to the effect of the sidetrack agreement on their respective liability for plaintiff's damages, Sorg Paper and Conrail settled plaintiff's claim for $200,000, with Sorg Paper contributing $112,500 and Conrail contributing $87,500. The parties stipulated in the settlement agreement that Sorg Paper's negligence caused the injury and that the sidetrack agreement was valid and binding. The parties also stipulated that if Conrail was found negligent under common law, independent of its FELA liability, it would reimburse Sorg Paper $12,500 so that each entity contributed one-half to the settlement. However, if Conrail was not found negligent, Sorg Paper would reimburse Conrail $87,500 so that Sorg Paper wholly indemnified Conrail. The parties agreed to

---

**2.** The indemnity provision of the sidetrack agreement states that

the industry further agrees to indemnify and hold harmless the railroad for loss, damage or injury from any act or omission of the industry, its employees (sic), or agents to the person or property of the parties hereto and their employees (sic) and to the person or property of any other person or corporation; and if any claim or liability other than from fire shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally.

present Conrail's third-party claim of indemnity to the district court as a trier of fact.

At trial, the district court determined that Sorg Paper had to prove by a preponderance of the evidence that (1) the railroad was negligent under common law standards, and (2) this negligence contributed to the injury of the plaintiff. If Sorg Paper failed to carry its burden, Conrail would be entitled to full indemnity. In his decision, Judge Weber found that (1) Conrail knew about general conditions in paper plants (being littered with loose paper which blows into the yard or onto the tracks, debris, paper bands, and lumber) and (2) plaintiff and others had complained and thus Conrail knew about (a) certain rough track conditions at a cross-over and (b) general unsafe conditions, *i.e.* "hazardous paper conditions" on the tracks and rolls of paper blocking Sorg Paper's entrance. Thus, the court concluded that "Conrail was negligent under common law standards through its acquiescence." In other words, according to the trial court, the record failed to indicate that Conrail "took the necessary corrective measures" despite its knowledge of dangerous conditions at Sorg Paper's yard, and therefore under the sidetrack agreement it would remain liable for one-half of plaintiff's damages.

### III.

A preliminary question here is what standard governs the determination of whether the railroad was "negligent" under the joint negligent clause of the sidetrack agreement. Some courts, finding that indemnity provisions identical to the one at issue were written in contemplation of the railroad's duty under FELA, have held that joint negligence means joint violation of the Act's standards. *See, e.g., Wanser v. Long Island R.R. Co.,* 238 F.2d 467, 469, 470 (2d Cir.1956). While indemnification is predicated on Conrail being liable to an employee under FELA, it does not invariably follow that mere proof of the railroad's liability under that Act is enough to constitute negligence. Use of the term "negligence" in the second clause of the indemnification agreement, compared to "any act or omission" in the first clause, *see supra* note 1, indicates that the parties intended to require more than a violation of the strict standards created by FELA to bar the railroad from full recovery. We read the term negligence to mean common law negligence—as the trial judge and other courts have determined. *See Burlington N., supra,* 671 F.2d at 285 ("Other courts read the term negligence to mean common law negligence.") (citing *Colonial Stores, Inc. v. Central of Ga. Ry. Co.,* 279 F.2d 777, 779–80 (5th Cir.1960)); *Baltimore and Ohio R.R. Co. v. Alpha Portland Cement Co.,* 218 F.2d 207, 212 (3d Cir.1955) (A different construction "would deprive the railroad of a right of indemnity given by the common law and ... such a result could hardly have been intended by the parties.").

Curiously, while Ohio common law controls the interpretation of the sidetrack agreement and the determination of Conrail's negligence, neither the parties nor the district court have cited any authority from that jurisdiction.[3] In Ohio, indemnity "arises from contract, express or implied, and is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement." *Travelers Indem. Co. v. Trowbridge,* 41 Ohio St.2d 11, 11, 321 N.E.2d 787 (1975). More specifically, indemnity is the right of a person

who is only secondarily liable to recover from the person primarily liable for proper expenditures paid to a third party injured through the violation of their common duties. A person is secondarily liable to a third party where his negligence is only passive and joins with active negligence of another to cause the injury. A person is primarily liable through active negligence or through ac-

---

**3.** We speculate that this analytical failure stems from the parties' preoccupation with the context in which the injury occurred, i.e., a railroad setting, instead of the more controlling factor of Ohio's indemnity law generally.

tual knowledge of a dangerous situation and acquiescence in the continuance thereof.

*Lattea v. City of Akron,* 9 Ohio App.3d 118, 458 N.E.2d 868, 872–73 (1982) (citations omitted). *See also Albers v. Great Cent. Transp. Corp.,* 145 Ohio St. 129, 60 N.E.2d 669, 671 (1945) ("This court is firmly committed to the proposition that where one perpetrates a tort and another, by reason of his relationship to the wrongdoer or by operation of law, may be made to respond in damages therefor, a case of primary and secondary liability arises.").

■ Sorg Paper had the primary, day-to-day obligation to keep the tracks in its yard clear from debris, just as Conrail had the primary duty to maintain the tracks. Moreover, as evidenced by the stipulations in the settlement and by the nature of its business, Sorg Paper, not Conrail, appears almost certainly to have created the condition which led to plaintiff's injury.[4] Under such circumstances we are fully satisfied that Ohio law, as interpreted by its Supreme Court, would find Sorg Paper primarily liable for Parsons' injury.

We place particular importance upon *Maryland Cas. Co. v. Frederick Co.,* 142 Ohio St. 605, 53 N.E.2d 795 (1944). There, the owners of a restaurant maintained a trap door in a sidewalk which was used by tradesmen delivering merchandise. The insurer of the restaurant sought indemnity against one of the tradesmen who left the trap door open, without keeping a proper lookout for pedestrians, at the time the plaintiff fell through it and injured himself. The Ohio Supreme Court in its syllabus stated:

> Where a person injured through the violation of a common duty owed by two persons, sues and recovers from one of the persons owing the common duty and such person against whom recovery is had did not participate in the act or omis-

sion causing the injury, such latter person is only secondarily liable and ... is entitled to indemnity from the one primarily liable, i.e., the one whose act or omission gave rise to the right of action. *Id.* Notwithstanding the restaurant's duty to the public to exercise reasonable care in maintaining and safeguarding the trap door, the court found that as between the restaurant and the tradesman, it was the latter (with the same duty of reasonable care as the restaurant) who directly caused the injury. *Id.* 53 N.E.2d at 797–98.

By analogy, Conrail's role here is similar to that "wherein municipalities have been held responsible for injuries to persons lawfully using the streets in a city, because of defects in the streets or sidewalks caused by the negligence or active fault of a property owner." *Union Stock Yards Co. v. Chicago, Burlington & Quincy R.R. Co.,* 196 U.S. 217, 224, 25 S.Ct. 226, 227, 49 L.Ed. 453 (1905). In such cases, "where the municipality has been called upon to respond because of its legal duty to keep public highways open and free from nuisances, recovery over has been permitted for indemnity against the property owner, the principal wrongdoer, whose negligence was the real cause of the injury." *Id.* Here, Sorg Paper owned the yard in which plaintiff's injury occurred and created the conditions which gave rise to injury; Conrail's legal duty to provide a safe place for its workers was not the primary or proximate cause of the injury.

The factual circumstances of this case are unlike those in *Union Stock Yards,* and *Colonial Stores, supra,* where indemnification was not allowed. In *Union Stock Yards,* both the railroad and the terminal company had failed in their duty to inspect a railroad car with defective brakes before putting it in use by those who might be injured thereby. There was "nothing in the facts as stated to show that

---

**4.** While no specific finding was made as to whether the paper or piece of wood that led to plaintiff's injury was manufactured by Sorg Paper, it was Sorg Paper's burden to rebut the inference that the debris was a result of its operations. Certainly the general conditions of the yard (e.g. rolls of paper, rubber bands, loose paper and lumber), which the lower court relied on to prove that Conrail had knowledge of the specific debris that caused plaintiff's injury, all originated from the positive acts of Sorg Paper. As Sorg Paper specifically admitted negligence, it is difficult to conclude that the result could be otherwise attributed.

any negligence or misconduct of the railroad company caused the defect in the car which resulted in the injury to the brakeman." 196 U.S. at 227, 25 S.Ct. at 229. The railroad did not own the defective car it eventually delivered to the terminal company. Accordingly, although a duty of inspection was first cast upon the railroad, the negligence of the parties was correctly deemed to be "of the same character" as the terminal company, neither one having "created" the condition which led to the injury. *Id.* at 228, 25 S.Ct. at 229.[5] The Court compared the case of *Union Stock Yards*, which involved an interpretation of Nebraska law, with other cases where

> the wrongful act of the one held finally liable created the unsafe or dangerous condition from which the injury resulted. The principal and moving cause [in those cases], resulting in the injury sustained, was the act of the first wrongdoer, and the other has been held liable to third persons for failing to discover or correct the defect caused by the positive act of the other.

196 U.S. at 228, 25 S.Ct. at 229. Likewise, indemnification was not allowed in *Colonial Stores*, where the court determined that the railroad was negligent and contributed to the plaintiff's injury by requiring him to step from a moving car to a platform upon which it knew or should have known that debris had been permitted to accumulate without warning him. 279 F.2d at 789.

 Here, any negligence of Conrail can only be deemed secondary or passive, and thus insufficient to bar indemnity *unless* Conrail had "actual knowledge of a dangerous situation and acquiesce[d] in the continuance thereof." *Lattea,* 458 N.E.2d at 872–73; *accord Walter v. Haukedahl,* 1991 WL 23552, 1991 Ohio App. LEXIS 808. The controlling issue is thus resolved by determining the type of knowledge and acquiescence required to render Conrail guilty of primary negligence by inference.

*See Continental Cas. Co. v. Ohio Edison Co.,* 126 F.2d 423, 428 (6th Cir.1942) ("From the failure of appellant's insured, possessed of this knowledge, to take precautionary measures, its own primary negligence may be inferred.").

While factually inapposite, *Ohio Edison, supra,* also involving Ohio law, helps us determine whether Conrail had the requisite knowledge and acquiescence to bar indemnity. In *Ohio Edison,* the owner of a retail clothing store, Richman Brothers Company ("Richman"), contracted with the Ohio Edison Company ("Edison") to inspect the store's sign, which extended about six feet from the front of its building. While painting the sign, an employee of Edison's subcontractor unintentionally permitted a bucket of paint to fall, which struck the plaintiff who was thereby injured. Richman's insurer sought indemnification from Edison. We refused to shift to Edison the blame for primary actionable negligence, and consequently we barred the insurer's claim for indemnity. Richman's knowledge and acquiescence in the dangerous conditions which caused the plaintiff's injury was evident: "No barricades or warning signs had been erected, which fact had been brought to the attention of the manager of Richman Bros. Company the day previous to the accident, together with information that paint was falling to the walk as a result of the work being done above." *Ohio Edison Co.,* 126 F.2d at 428 (citation omitted).

In sum, Richman had knowledge of and "acquiesced in *the condition that gave rise to the underlying liability.*" *Illinois Cent. Gulf R.R. Co. v. Crown Zellerbach Corp.,* 859 F.2d 386, 390 (5th Cir.1988) (emphasis added). *See also Globe Indem. Co. v. Schmitt,* 142 Ohio St. 595, 53 N.E.2d 790, 794 (1944) (In barring indemnity, the Ohio Supreme Court distinguished *Ohio Edison* because in that case "the corporation through which indemnity was claimed had actual knowledge that a perilous condition existed on its premises and did nothing at

---

**5.** *Cf. Pennsylvania R.R. Co. v. Snyder,* 55 Ohio St. 342, 45 N.E. 559 (1896) (while both railroads could be found negligent due to their duties to inspect, the negligence of the railroad delivering

its own defective car to the other railroad was undoubtedly the primary and proximate cause of plaintiff's injury). Indemnification was not discussed in *Snyder.*

all to correct it."). Based on these cases, under Ohio law it seems that Conrail must have had knowledge of the condition which caused the injury, *i.e.*, debris on or around sidetrack 924 where the injury occurred, before it could be deemed negligent and thus barred from indemnity.

Likewise, railroad indemnity cases from other jurisdictions focus on whether there was knowledge of and acquiescence in the very condition which caused the injury. *Steed v. Central of Georgia Ry. Co.*, 529 F.2d 833, 838 (5th Cir.1976) ("It is clear that the accumulation of dirt and debris on the track area for which Riegel was responsible *was the cause* of the derailment and subsequent injury and that, prior to the derailment, no member of Central's crew, other than Steed, saw or was in a position to see the accumulation which caused the derailment.") (emphasis added); *Pennsylvania R.R. Co. v. Erie Ave. Warehouse Co.*, 302 F.2d 843, 849 (3d Cir.1962) (railroad "had been adequately alerted" to the dangerous condition or "special risk" which "caused this accident long before the mishap occurred," *i.e.* too little clearance between siding and the track, and took no corrective action). *See also Hughes Bros.*, 671 F.2d at 279; *Missouri Pacific R.R. Co. v. Arkansas Oak Flooring Co.*, 434 F.2d 575, 577 (8th Cir.1970).

The record does not support the inference that Conrail was on notice of any dangerous condition in the specific area where the accident occurred. The only evidence bearing on the condition of sidetrack 924 at or prior to plaintiff's injury suggests that it was cleaner than the average area in Sorg Paper's yard, or other paper yards for that matter. For example, when asked how the Sorg Paper yard compared with other paper plants that Conrail switched, Conrail Trainmaster Robert Bradford testified:

> I would say on the ones that I know in my territory that we handled, paper plants, it might in some areas of Sorg be

a little cleaner than others, but in other areas of Sorg, I would say it was typical.

When asked whether there were more or fewer complaints about sidetrack 924 as compared to other areas of Sorg Paper, Bradford testified:

> In that particular area, I would probably say there was less complaints. I don't recall any, but I would say whenever I've been back there, that was always one of the cleaner places back there.

As with Bradford, Vernon Lakes could not remember whether there had been any complaints about debris in the area of sidetrack 924, either prior to or around the time of plaintiff's accident. "Best [he] could remember, the place was relatively clean." Shelby Pelfrey, Traffic Manager for Sorg Paper, also testified that the area at issue was kept in fairly good condition during the time period in which plaintiff's accident occurred.

Based on the record, the district court could not (and did not) make any factual findings that Conrail had knowledge of debris or other potentially dangerous conditions around sidetrack 924 at or prior to the time of plaintiff's accident. Instead, it determined that Conrail's knowledge of (1) general conditions in paper plants (being littered with loose paper which blows into the yard or onto the tracks, debris, paper bands and lumber), (2) certain rough track conditions at a cross-over not in the vicinity of sidetrack 924, and (3) rolls of paper which at one time blocked Sorg Paper's entrance, coupled with its acquiescence in these conditions, was enough to find it negligent under common law. However, no court has ever found a railroad negligent because it knew of and acquiesced in general non-causal conditions common to a certain industry, such as occasional debris in the yards of paper mills.[6] Otherwise, railroads would be found negligent for any injury occurring while servicing an industry that occasionally creates hazardous con-

---

**6.** We were not able to glean from the map provided in the record the exact measurements of Sorg Paper's yard; however, counsel from

Sorg Paper stated that the yard was large, probably 100 yards by 60 yards.

ditions in its yard, as all industries may do, and indemnity agreements would not be worth much.[7]

We find that while the district court appears to have applied the law correctly, its factual conclusion that Conrail was on notice of the dangerous condition which caused the injury and acquiesced in it, is clearly erroneous. Our holding does not imply, however, that Conrail could not be held primarily liable unless it had knowledge of and acquiesced in the *specific* piece of paper and lumber which caused plaintiff's injury. We simply conclude that the railroad's knowledge of the dangerous condition was not "of sufficient character and quality to show that it acted negligently." *Burlington N., Inc.*, 671 F.2d at 286. In sum, Conrail's only negligence consisted of Sorg Paper's negligence vicariously imputed to it by virtue of its nondelegable duty to plaintiff to provide him with a safe place to work. Such negligence is not sufficient to bar indemnity. *Wanser*, 238 F.2d at 470.

### IV.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for entry of judgment in favor of Conrail.

---

7. We express no opinion on what effect a general hazardous condition which is ongoing and open and notorious would have in relation to the indemnity agreement. While paper may have occasionally blown throughout Sorg Paper's yard, the record is quite clear that the yard as a whole was not covered with debris most or all of the time and that Conrail and Sorg Paper were actively carrying out their respective maintenance programs. We do note, however, that if Sorg Paper's yard was littered to a greater extent than the record evidences, either or both parties would likely be reluctant to enter into an indemnity agreement such as the one at issue here.